UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

WILLIAM MURRAY,

                         Plaintiff,

        v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                         Defendant.

_____

<u>DECISION & ORDER</u>

15-CV-6384P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff William Murray ("Murray") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Supplemental Security Income ("SSI"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 7).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 8, 10). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and complies with applicable legal standards. Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Murray's motion for judgment on the pleadings is denied.

# BACKGROUND

## I.      Procedural Background

Murray protectively filed for SSI on April 16, 2012, alleging disability beginning on October 15, 2010, due to right leg problems.  (Tr. 151, 155).[1]  On June 29, 2012, the Social Security Administration denied Murray's claim for benefits, finding that he was not disabled.  (Tr. 68).  Murray requested and was granted a hearing before Administrative Law Judge John P. Costello (the "ALJ").  (Tr. 83, 100-04).  The ALJ conducted a hearing on February 18, 2014 in Rochester, New York.  (Tr. 28-49).  Murray was represented at the hearing by his attorney.  (Tr. 28).  In a decision dated March 20, 2014, the ALJ found that Murray was not disabled and was not entitled to benefits.  (Tr. 17-27).

On April 30, 2015, the Appeals Council denied Murray's request for review of the ALJ's decision.  (Tr. 1-5).  Murray commenced this action on June 24, 2015, seeking review of the Commissioner's decision.  (Docket # 1).

## II.      Relevant Medical Evidence[2]

### A.      Treatment Records

#### 1.      Queenan Family Medicine and Maternity Care

Murray began treatment with Emily Queenan ("Queenan"), MD, on September 8, 2011.  (Tr. 279-80).  Murray reported that he had not received routine medical care during the previous eighteen years.  (*Id.*).  He complained of ongoing pain in his right ankle and knee, as well as his low back.  (*Id.*).  According to Murray, he had suffered a hairline fracture in his right ankle several years ago.  (*Id.*).  He had not had surgery relating to the fracture, but had been

---

[1]  The administrative transcript shall be referred to as "Tr. __."

[2]  Those portions of the treatment records that are relevant to this decision are recounted herein.

placed in an air cast. (*Id.*). Murray reported that since that time he had suffered pain in his ankle that was exacerbated by prolonged walking and standing. (*Id.*). He had recently been employed as a cook and was able to manage eight-hour workdays, although he had difficulty ambulating by the end of the day. (*Id.*). According to Murray, his original schedule had provided him with a day off every other day, which allowed him to recuperate. (*Id.*). His schedule had been changed thereafter, prompting him to stop working because he was unable to "handle it." (*Id.*).

With respect to his right knee, Murray indicated that it "gave out" several years after his ankle injury, and he attributed his knee pain to limping caused by the ankle injury. (*Id.*). According to Murray, his knee pain was exacerbated by prolonged walking and standing and he experienced the greatest pain when he flexed his knee to sit down. (*Id.*). He endorsed some instability, but indicated that he was able to ambulate using small steps. (*Id.*). Murray reported that he had long experienced low back pain, which interfered with his sleep and had increased over the previous six months. (*Id.*). Murray indicated that he had gained in excess of one hundred pounds during the previous eighteen months, which may have exacerbated his back pain. (*Id.*). He believed that he walked with a very flat foot and indicated that he had previously taken Flexeril, with no relief. (*Id.*).

Upon examination, Queenan observed that Murray appeared comfortable and in no acute distress. (*Id.*). Examination of his right ankle demonstrated no effusion and good stability, but tenderness to palpation of the medial malleolus. (*Id.*). Examination of the right knee also demonstrated good stability and no effusion, with tenderness to palpation of the medial patella border and the lateral joint line. (*Id.*). His gait was normal, and a straight leg raise test was negative, but there was mild tenderness of the bilateral paraspinal muscles. (*Id.*).

Queenan assessed that Murray might suffer from post-traumatic arthritis in his right ankle.  (*Id.*).  She noted that "social services" required a specialist evaluation and, due to the chronicity of his pain, she referred him to Sports Medicine to obtain imaging.  (*Id.*).  Queenan opined that weight loss would assist his recovery and considered referring him to a podiatrist for a consultation.  (*Id.*).  Queenan also assessed that he might suffer from degenerative arthritis in his right knee, as well as patellofemoral knee pain.  (*Id.*).  She recommended that Murray begin a home exercise program and begin formal physical therapy once he had been evaluated at Sports Medicine.  (*Id.*).  With respect to his low back pain, Queenan assessed a musculoskeletal strain caused by weight gain and other impairments.  (*Id.*).  She recommended that he take acetaminophen or Mobic for pain, perform home exercises, and lose weight.  (*Id.*).  She scheduled him for a follow-up appointment for a physical on October 3, 2011.  (*Id.*).

On October 3, 2011, Queenan emailed Murray the results of his bloodwork, which demonstrated high cholesterol and a vitamin D deficiency.  (Tr. 282).  Treatment notes indicate that Murray cancelled his follow-up appointment due to insurance issues.  (Tr. 279).

## 2. URMC Orthopaedics and Rehabilitation

On March 27, 2012, Murray attended an appointment with John Paul Ketz ("Ketz"), MD, at the Orthopaedics and Rehabilitation Department of the University of Rochester Medical Center.  (Tr. 201-02).  During the appointment, Murray complained of ankle pain and reported a previous ankle fracture that had been treated without surgery.  (*Id.*).  He indicated that his pain was exacerbated by activity and prolonged weight bearing, but that he did not experience any numbness, tingling, or acute injury.  (*Id.*).  Murray reported that he had taken anti-inflammatory medication without relief.  (*Id.*).

Upon examination, Murray did not exhibit any distress. (*Id.*). He was unable to perform a single stance heel raise and had significant hindfoot valgus compared to his contralateral side. (*Id.*). He demonstrated no ankle instability and appeared neurovascularly intact. (*Id.*). Ketz assessed that Murray suffered from adult-acquired hindfoot deformity and recommended inserts and a fracture walker boot. (*Id.*). If Murray failed to improve after four weeks, Ketz would consider surgical intervention. (*Id.*). Imaging of Murray's right ankle taken on April 2, 2012 demonstrated a valgus deformity with degenerative changes, but no fracture line. (Tr. 212-13).

On April 15, 2012, Murray returned for a follow-up appointment with Ann S. Chateauneuf ("Chateauneuf"), PA, and Ketz. (Tr. 202-03). Murray reported continued pain in his right ankle and foot. (*Id.*). He also reported some numbness and tingling, along with back pain radiating to his foot. (*Id.*). He complained of increased cramping and indicated that he was unable to return to work as a chef because he could not tolerate prolonged standing. (*Id.*). A physical examination demonstrated no acute distress, but continued hindfoot valgus and difficulty performing a single stance heel raise. (*Id.*). He demonstrated discomfort during the examination and some limited range of motion in his right ankle. (*Id.*). He appeared to be neurovascularly intact. (*Id.*). Chateauneuf referred Murray for a spine evaluation. (*Id.*). She also referred him to Dr. Elfar for evaluation of hand symptoms. (*Id.*). She recommended that he continue to remain out of work and to use his prescribed boot and inserts. (*Id.*). She also prescribed Tramadol for pain. (*Id.*).

On May 2, 2012, imaging of Murray's lumbar spine demonstrated loss of disc space at L3-L4, L4-L5 and, to a lesser extent, at L5-S1. (Tr. 214). The imaging also

demonstrated facet joint sclerosis at L3-L4, L4-L5, and L5-S1 and osteophytes at L3, L4 and L5. (*Id.*).  The findings were consistent with moderately severe degenerative changes.  (*Id.*).

On May 4, 2012, Murray attended an appointment with William Gruhn ("Gruhn"), PA, for evaluation of his back pain.  (Tr. 204-05).  Upon examination, Gruhn noted that Murray was morbidly obese, but was able to ambulate normally and to flex and extend his lumbar spine.  (*Id.*).  His back was not tender to palpation, and a straight leg raise test was negative.  (*Id.*).  He demonstrated full strength and reflexes bilaterally.  (*Id.*).  Imaging demonstrated marked disc space narrowing between L5 and S1, and Gruhn assessed that he suffered from disc degeneration at L5-S1.  (*Id.*).  According to Gruhn, Murray's obesity prevented more advanced imaging or a nerve conduction study.  (*Id.*).  Gruhn recommended physical therapy and continued treatment with Meloxicam.  (*Id.*).

Murray attended another appointment with Ketz on June 16, 2012.  (Tr. 206-07). Murray reported ongoing pain and that he had not noticed any appreciable difference with the prescribed inserts.  (*Id.*).  Murray reported that his spine had been evaluated and minor degenerative changes had been noted, although his lower back was not likely the cause of his leg discomfort.  (*Id.*).  An examination revealed no instability or neurovascular problems, although Murray remained unable to perform a single stance heel raise and demonstrated a misaligned ankle.  (*Id.*).  Treatment options included trying other bracing options and surgery, although surgery was not ideal given Murray's young age.  (*Id.*).  Murray expressed interest in evaluating his options and possibly undergoing a gastric bypass, which Ketz agreed would be a reasonable first step to resolve his foot pain.  (*Id.*).

On December 27, 2012, Murray returned for an appointment with Ketz. (Tr. 240).  He was assessed to suffer from stage three adult acquired flat foot deformity with

tendo-Achilles contracture.  (*Id.*).  Murray complained of ongoing discomfort despite using

inserts, treating with anti-inflammatories and icing, and resting his ankle and foot.  (*Id.*).  He had

failed conservative forms of intervention and wanted to proceed with surgical intervention.  (*Id.*).

Ketz reviewed imaging of Murray's ankle and performed a physical examination.

(*Id.*).  Ketz assessed that Murray suffered significant pain from his flat foot deformity and

discussed surgical risks and Murray's prognosis after surgical intervention, including likely

progressive arthrosis in his ankle joint following the surgery.  (*Id.*).

On January 10, 2013, Murray attended a preoperative appointment with Therese

M. Cottrell ("Cottrell"), NP, at Ketz's office.  (Tr. 237-39).  Cottrell conducted a physical

examination and provided preoperative counseling.  (*Id.*).  Ketz performed the surgery on

January 24, 2013, without complications.  (Tr. 232-37).  On February 2, 2013, Murray was

discharged home with health care services.  (*Id.*).

Murray attended a postoperative appointment with Ketz on February 12, 2013.

(Tr. 230-31).  Murray reported that his pain was improving and that he remained primarily

non-weight bearing on his right leg.  (*Id.*).  A physical examination demonstrated continued

swelling, although images of the leg revealed satisfactory placement of hardware and satisfactory

alignment of the joint.  (*Id.*).  Ketz recommended that Murray return in four weeks for additional

imaging, removal of sutures, and a cast change.  (*Id.*).

On May 31, 2013, Murray attended an appointment with Katherine C. Ma ("Ma"),

MD, FEL, at Ketz's office.  (Tr. 300).  Murray complained of continuing pain in his right leg.

(*Id.*).  According to Ma, the pain Murray described seemed nerve-related.  (*Id.*).  Murray

continued to wear a high-tide ankle boot, explaining that he had increased discomfort with a

brace.  (*Id.*).  He requested a refill of his pain medication.  (*Id.*).

Imaging of his ankle demonstrated osteopenia throughout his bones, but that the hardware and alignment had remained in place. (*Id.*). An examination demonstrated well-healed incisions and minimal swelling. (*Id.*). Ma suggested that Murray attempt to wean himself into the brace and wean off the pain medication. (*Id.*). She suggested that if he continued to experience discomfort, she would consider a referral to a pain clinic. (*Id.*). Ketz also examined Murray. (*Id.*).

Murray returned for an appointment with Amanda Lambert ("Lambert"), PA, in Ketz's office on July 26, 2013. (Tr. 299). He reported that his pain was improving, although he still experienced pain and swelling with prolonged standing. (*Id.*). He requested a note permitting him to return to work with restrictions. (*Id.*). Imaging of his ankle demonstrated that the hardware remained in place and that his alignment was unchanged. (Tr. 250). Severe degenerative joint disease was observed in the first MTP joint and the DIP joint. (*Id.*). A hallux valgus deformity with bunion and a calcaneal spur were evident. (*Id.*).

Upon examination, Murray was in no acute distress and his incisions appeared to be healing well. (*Id.*). There was moderate swelling of the right foot and ankle, although he had good motion and no instability was evident. (*Id.*). Lambert assessed that Murray was progressing well and advised him to continue working on his range of motion and strengthening exercises. (*Id.*). She provided a note for work and advised him to follow up in three months. (*Id.*).

On October 28, 2013, Murray attended another appointment with Lambert. (Tr. 294). During the appointment, Murray reported that his pain had been improving until approximately one month ago, when he started to experience pain in the heel and along his toes. (*Id.*). According to Murray, his pain and swelling increased with prolonged standing and

walking.  (*Id.*).  He reported that he continued to perform his ankle exercises.  (*Id.*).  Imaging of

his ankle demonstrated satisfactory placement of the hardware and alignment of the joint.  (*Id.*).

There were degenerative changes at the first MTP joint and a hallux valgus with bunion.

(Tr. 297).

Upon examination, Lambert noted no acute distress and well-healed incisions

with minimal swelling.  (*Id.*).  Murray demonstrated good range of motion and no instability.

(*Id.*).  Lambert recommended that Murray continue to perform range of motion and

strengthening exercises, and provided him a new prescription for inserts.  (*Id.*).  She

recommended that he return for evaluation in six months.  (*Id.*).  Ketz conducted a physical

examination of Murray and concurred with Lambert's assessment and plan.  (*Id.*).

### 3.     Unity Faculty Partners

In September 2011, Murray attended a new patient appointment with Ruth

Kouides ("Kouides"), MD, at Unity Faculty Partners.  (Tr. 197-200).  Murray reported that he

had not received primary health care for the previous twenty years and that he had suffered an

ankle fracture approximately seven years earlier.  (*Id.*).  Murray reported that he had recently

relocated from Rhode Island, lived with his sister, and had previously worked as a chef, but was

currently unemployed.  (*Id.*).  Murray complained of right ankle pain, which he attributed to his

previous fracture.  (*Id.*).  According to Murray, he had been given an air cast after imaging and

referred to a surgeon, but never evaluated due to lack of insurance.  (*Id.*).  He reported that he did

not experience pain while resting, but his pain could reach a level ten out of ten after prolonged

walking.  (*Id.*).  He also reported gaining approximately one hundred pounds during the previous

few years.  (*Id.*).

Upon physical examination, Murray presented as mildly distressed due to pain, with tenderness noted in his right foot.  (*Id.*).  Kouides prescribed Mobic as needed for pain, ordered imaging of the foot, and referred him to "orthopedics."  (*Id.*).  She also ordered blood work to assess his obesity and advised him to return in one month.  (*Id.*).

Approximately nine months later, Murray returned for an appointment with Kouides.  (Tr. 271-75).  Murray reported that Ketz had performed surgery on his ankle in January 2013, but he was not certain of his diagnosis.  (*Id.*).  He reported that his pain was worse in the morning and that he was taking Tramadol to manage it, which caused fatigue and lethargy.  (*Id.*).  He indicated that Ketz would not prescribe more Tramadol and requested a different pain medication and a referral to a pain management clinic.  (*Id.*).  He continued to weigh in excess of four hundred pounds and reported difficulty exercising due to pain in his ankle.  (*Id.*).  He expressed interest in bariatric surgery.  (*Id.*).

Kouides was hesitant to prescribe an NSAID without current blood work.  (*Id.*).  She advised Murray to continue taking Tramadol and that she would consider a referral to a pain clinic if his pain did not resolve.  (*Id.*).  She encouraged him to exercise if his pain permitted and referred him for bariatric surgery.  (*Id.*).  She assessed that his blood pressure was elevated, but suspected that was due to pain and would resolve once his pain was better managed.  (*Id.*).

Murray returned for an appointment with Kouides on August 1, 2013. (Tr. 266-70).  Murray complained of continuing right ankle pain and pain in his left shoulder, which he attributed to his exercise program.  (*Id.*).  According to Murray, he had been exercising regularly in an attempt to lose weight, but was limited to upper body exercise due to his continued ankle pain.  (*Id.*).  He indicated that he was considering joining a gym so that he could use an elliptical machine.  (*Id.*).  Murray was no longer interested in bariatric surgery and wanted

to make lifestyle changes to address his obesity. (*Id.*). He reported that he had recently been evaluated by Ketz, who had placed Murray on disability until his next appointment in October 2013. (*Id.*).

Kouides assessed that Murray suffered from high blood pressure and high cholesterol, prescribed medications to address those issues, and strongly encouraged him to lose weight. (*Id.*). She continued his prescription for Tramadol and prescribed Naproxen to address his ongoing pain. (*Id.*). She hoped to gradually transition him from Tramadol to Naproxen only. (*Id.*).

On October 10, 2013, Murray attended another appointment with Kouides. (Tr. 261-65). Murray reported that his ankle pain had initially improved, but recently had worsened significantly, causing him to take more Tramadol than usual. (*Id.*). He had attempted to schedule an appointment with Ketz, but was unable to schedule one earlier than the end of the month. (*Id.*). He described the pain as severe and also complained of parastehsieas in his foot. (*Id.*). He reported that he had been exercising, but not regularly because his exercise partner was injured. (*Id.*). He planned to begin a new exercise routine and to join a gym. (*Id.*). Kouides advised Murray to continue taking Tramadol and prescribed Gabapentin and Tylenol to alleviate his pain. (*Id.*).

**B.     Medical Opinion Evidence**

**1.     Harbinder Toor, MD**

On June 26, 2012, state examiner Harbinder Toor ("Toor"), MD, conducted a consultative internal medicine examination. (Tr. 223-27). Murray reported that he suffered from obesity and chronic pain in his right ankle. (*Id.*). He reported that the pain was constant, sharp, and a level of six out of ten. (*Id.*). He also experienced swelling in his ankle. (*Id.*). He also

complained of ongoing, sometimes sharp, pain in his right knee, which would swell at times. (*Id.*).  Murray reported that he also suffered from chronic low back pain.  (*Id.*).  According to Murray, the pain was typically dull and intermittent, although at times it became sharp and intense.  (*Id.*).  Murray reported that the pain sometimes radiated to his right leg.  (*Id.*).  Murray reported that he had suffered from flat feet since childhood and had difficulty standing, walking, squatting, sitting, bending, and lifting.  (*Id.*).

Murray reported that he was able to care for his personal hygiene and sometimes cooked and cleaned, but did not do laundry, shop, or care for children.  (*Id.*).  He watched television and sometimes read, but did not go out, play sports, socialize, or participate in hobbies. (*Id.*).

Upon examination, Toor noted that Murray appeared to be markedly obese with an abnormal gait that slightly limped to the right side.  (*Id.*).  He used no assistive devices and did not need help to change for the examination, but had difficulty getting on and off the examination table and in and out of his chair.  (*Id.*).  He declined to attempt heel to toe walking, and could squat to twenty percent of full.  (*Id.*).

Toor noted that Murray's cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally.  (*Id.*).  Toor identified no scoliosis, kyphosis, or other abnormality in the thoracic spine.  (*Id.*).  Toor found that Murray's lumbar forward flexion was limited to twenty degrees, extension was zero degrees, lateral flexion and rotation were thirty degrees.  (*Id.*).  The straight leg raise was positive in the sitting and supine positions.  (*Id.*).  He demonstrated full range of motion in the shoulders, elbows, forearms, and wrists.  (*Id.*).  Murray had some tenderness in his right ankle and right knee, with some range of motion limitations.  (*Id.*).  He demonstrated no sensory deficits in his extremities, and his

strength was intact.  (*Id.*).  Additionally, Toor found that Murray's hand and finger dexterity was

intact and his grip strength was five out of five bilaterally.  (*Id.*).  Toor reviewed imaging of

Murray's right ankle, which was negative for abnormality.  (*Id.*).

Toor diagnosed Murray with a history of injury in the right ankle, arthritis in the

right knee, lower back pain, obesity, and flat feet.  (*Id.*).  He opined that Murray's prognosis was

fair and that "pain and obesity interfere with his physical routine and balance."  (*Id.*).  Toor also

opined that Murray had moderate to severe limitations with standing, walking, squatting or

heavy lifting, and moderate limitations with sitting for a long time.  (*Id.*).

## 2.   **Amanda M. Lambert, PA**

On July 26, 2013, Lambert assessed that Murray was able to work with

limitations.  (Tr. 255).  According to Lambert, Murray needed to be provided the ability to

alternate between sitting and standing and was unable to engage in running, squatting, kicking,

kneeling, or deep knee bending.  (*Id.*).  Additionally, Lambert opined that Murray was unable to

stand or walk for more than one hour at a time or for more than four hours during an eight-hour

workday.  (*Id.*).

## 3.   **Ruth Kouides, MD**

On February 11, 2014, Kouides completed a Residual Functional Capacity

("RFC") Questionnaire.  (Tr. 308-10).  Kouides indicated that Murray had attended

approximately six appointments during the course of the previous thirty months.  (*Id.*).  She

diagnosed Murray with status post right triple arthrodecis with tendo-Achilles lengthening and

assessed, based upon Ketz's opinion, that his prognosis was limited.  (*Id.*).  According to

Kouides, Murray suffered from pain in his right foot that increased with weight bearing but

seldom interfered with his attention and concentration.  (*Id.*).

13

Kouides opined that Murray was unable to walk the distance of a city block, and was able to sit for approximately ten to fifteen minutes and walk for less than five minutes at a time. (*Id.*). According to Kouides, Murray could sit for approximately three hours and stand or walk for approximately one hour during an eight-hour workday. (*Id.*). She opined that he would need a job that permitted him to alternate between sitting and standing and would need to take unscheduled breaks every hour for approximately five minutes unless he was permitted to elevate his leg. (*Id.*).

Kouides opined that Murray could occasionally lift less than ten pounds and never more than ten pounds. (*Id.*). According to Kouides, Murray did not have any limitations for repetitive reaching, handling, or fingering. (*Id.*). She assessed that he was likely to be absent once or twice per month due to his impairments and was not a malingerer. (*Id.*). Kouides opined that Murray was physically capable of working an eight-hour workday provided he was permitted to change his position frequently and to elevate his leg. (*Id.*).

### III.    Non-Medical Evidence

During the administrative hearing, Murray testified that he lived with his sister and that his only source of income was assistance from the Department of Social Services. (Tr. 33). He reported that he was forty years old and had graduated from high school. (*Id.*). He reported previous employment as a chef and in construction. (Tr. 33-36).

Murray testified that his primary impairment was his right foot, which caused him significant pain. (Tr. 37). According to Murray, he had injured his foot several years ago and had treated his foot with air casts, physical therapy, surgery, and pain medication. (*Id.*). Murray reported that he had had surgery approximately one year prior to the hearing, but continued to

suffer from pain and limited motion in his ankle.  (Tr. 37-38).  Murray estimated that he could

stand and walk for no more than ten minutes at a time.  (Tr. 38-39).  He also indicated that he

spent the majority of his day sitting and could sit for a long time if his leg were elevated.  (*Id.*).

Otherwise, he was only able to sit for approximately ten or fifteen minutes at a time, with

constant adjusting of his position.  (*Id.*).  According to Murray, he sat with his foot elevated for

most of the day.  (Tr. 39, 41).

Murray indicated that he also experienced pain in his knee, hip, and back due to

limping and obesity.  (Tr. 39-41, 43-44).  He had an upcoming appointment with Ketz, his

orthopedic surgeon, to assess whether he needed surgery to address his pain.  (Tr. 40).

According to Murray, his obesity made it difficult to participate in activities due to breathing

issues and back pain, and he was exploring bariatric surgery.  (Tr. 41, 43).  He reported that he

was able to grocery shop, but did so as quickly as possible.  (Tr. 41).  He testified that he was

also able to drive, although it hurt his foot, especially if he drove for longer than thirty minutes.

(*Id.*).

Murray testified that he managed his pain with Tramadol, extra-strength Tylenol,

Lexicam, Gabapentin, and Nortriptyline.  (Tr. 42).  According to Murray, his medications caused

dry mouth, dizziness, and sweating.  (*Id.*).  Additionally, Gabapentin caused him extreme

drowsiness, requiring full-day naps.  (Tr. 42-43).  For this reason, he tried to avoid frequent use

of Gabapentin.  (*Id.*).

A vocational expert, Julie Andrews ("Andrews"), also testified during the hearing.

(Tr. 44-48).  The ALJ first asked Andrews to characterize Murray's previous employment.

(Tr. 46).  According to Andrews, Murray had previously been employed as a short order cook,

construction worker, and kitchen supervisor.  (*Id.*).

The ALJ asked Andrews whether a person would be able to perform any of Murray's previous jobs if he were of the same age, had the same education and vocational profile, and could perform work at the sedentary exertional level, but was permitted to stand briefly after sitting for thirty minutes.  (*Id.*).  Andrews testified that such an individual could not perform Murray's previous positions, but that other positions existed in the national economy that such an individual could perform, including brake linings coater and label pinker. (Tr. 46-47).

The ALJ asked whether an individual with the same limitations, but who also needed to elevate his right leg approximately half the time he was seated, would be able to perform the identified positions.  (Tr. 47).  Andrews testified that such an individual would be able to perform the identified positions.  (*Id.*).

Next, the ALJ asked Andrews whether an individual with the same limitations, but who was able to walk no more than one hour and sit for no more than three hours in a workday would be able to perform the previously-identified positions.  (*Id.*).  Andrews testified that such an individual would be unable to maintain competitive employment.  (*Id.*).  The ALJ asked Andrews whether an individual with the limitations previously-identified, but who was also off-task approximately twenty percent of the workday, would be able to perform the previously-identified positions.  (*Id.*).  Andrews testified that such an individual would be unable to maintain completive employment.  (*Id.*).

The ALJ asked Andrews whether her testimony was consistent with the Dictionary of Occupational Titles ("DOT").  (Tr. 48).  Andrews testified that it was, with the exception of the "sit/stand option."  (*Id.*).  According to Andrews, the DOT did not address a "sit/stand" option, but her experience and knowledge of the positions supported her testimony

that the positions she identified would permit the option of alternating between sitting and

standing.  (*Id.*).

## DISCUSSION

**I.      Standard of Review**

This Court's scope of review is limited to whether the Commissioner's

determination is supported by substantial evidence in the record and whether the Commissioner

applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004)

("[i]n reviewing a final decision of the Commissioner, a district court must determine whether

the correct legal standards were applied and whether substantial evidence supports the

decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also*

*Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo*

whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's

conclusions are supported by substantial evidence in the record as a whole or are based on an

erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C.

§ 405(g), a district court reviewing the Commissioner's determination to deny disability benefits

is directed to accept the Commissioner's findings of fact unless they are not supported by

"substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to

any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is

defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401

(1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). In assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five-steps are:

(1)    whether the claimant is currently engaged in substantial gainful activity;

(2)    if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

(3)    if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;

(4)    if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and

> (5)     if not, whether the claimant retains the residual functional
>          capacity to perform any other work that exists in significant
>          numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

### A.     <u>The ALJ's Decision</u>

In his decision, the ALJ followed the required five-step analysis for evaluating

disability claims.  (Tr. 22-27).  Under step one of the process, the ALJ found that Murray had not

engaged in substantial gainful activity since April 16, 2012, the application date.  (Tr. 22).  At

step two, the ALJ concluded that Murray had the severe impairments of degenerative changes at

the first metatarsophalangeal joint, right ankle/knee and lumbar pain post status foot surgery, and

obesity.  (*Id.*).  The ALJ concluded that Murray's other impairments, including cramps, diarrhea,

high cholesterol, and vitamin D deficiency, were not severe.  (*Id.*).  At step three, the ALJ

determined that Murray did not have an impairment (or combination of impairments) that met or

medically equaled one of the listed impairments.  (Tr. 22-23).  The ALJ concluded that Murray

had the RFC to perform sedentary work, but that he had to be permitted to elevate his leg half of

the time while seated and to stand briefly after sitting for thirty minutes.  (Tr. 23-25).  At steps

four and five, the ALJ determined that Murray was unable to perform his prior positions, but that

other positions existed in the national economy that Murray could perform, including brake

linings coater and label pinker.  (Tr. 26-27).  Accordingly, the ALJ found that Murray was not

disabled.  (*Id.*).

B.     **Murray's Contentions**

Murray contends that the ALJ's determination is not supported by substantial evidence.  (Docket # 9).  First, Murray contends that the ALJ erred at step five because the vocational expert's testimony regarding elevating a leg during the workday was not consistent with the DOT and the ALJ failed to resolve that inconsistency on the record.  (Docket ## 9 at 12-14; 11 at 2-7).  Next, Murray maintains that the physical RFC assessment is not based upon substantial evidence because the ALJ's conclusion that Murray could perform sedentary work was inconsistent with the moderate sitting limitation assessed by Toor.  (Docket # 9 at 14-17).  Finally, Murray maintains that the ALJ erred in assessing his credibility.  (*Id.* at 17-19).

II.    **Analysis**

A.     **RFC Assessment**

An individual's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis."  *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)).  In making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis."  *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)).  "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms."  *Stanton v. Astrue*, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 370 F. App'x 231 (2d Cir. 2010).

I turn first to Murray's contentions that the ALJ's RFC assessment is flawed because he failed to account for the sitting limitations assessed by Toor and Kouides. According to Murray, Toor's opinion that Murray suffered from a moderate limitation for prolonged sitting is inconsistent with his conclusion that Murray could perform sedentary work, which generally requires sitting for up to six hours per workday. (Docket # 9 at 15-17). This error is further underscored, Murray contends, because his treating physician, Kouides, also opined that Murray could only sit for up to three hours during a workday, which is inconsistent with the conclusion that Murray would be able to perform the requirements of sedentary work. (*Id.*).

In this case, the ALJ concluded that Murray retains the ability to perform the exertional requirements of sedentary work with some additional modifications. (Tr. 23). In general, sedentary work requires the ability to lift up to ten pounds at a time, to lift and carry light objects occasionally, to stand and walk up to two hours per workday, and to sit for up to six hours of an eight-hour workday. *See Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996) (citing 20 C.F.R. § 404.1567(a)). I conclude that the ALJ's determination that Murray was capable of performing sedentary work so long as he was provided the ability to alternate positions and elevate his leg was well-supported by Toor's opinion and the other evidence contained in the record.

As an initial matter, "several courts have upheld an ALJ's decision that the claimant could perform light or sedentary work even when there is evidence that the claimant had moderate difficulties in prolonged sitting or standing." *Carroll v. Colvin*, 2014 WL 2945797, *4 (W.D.N.Y. 2014); *Harrington v. Colvin*, 2015 WL 790756, *14 (W.D.N.Y. 2015) ("other courts do not consider an opinion assessing moderate limitations for sitting, standing and walking inconsistent with a determination that the claimant can perform the requirements of light

or medium work") (collecting cases).  In this case, Murray's ability to sit for up to six hours per

day is supported by other substantial evidence in the record, and the ALJ provided reasons

"tending to support the finding that, despite the moderate limitations[,] . . . [plaintiff] could still

perform [sedentary] work."  *Carroll v. Colvin*, 2014 WL 2945797, at *4; *see Collier v. Colvin*,

2016 WL 4400313, *3 (W.D.N.Y. 2016) (consultative opinion that plaintiff was moderately

limited in standing and walking supported ALJ's RFC assessment that plaintiff could perform

light work where ALJ's decision summarized medical evidence demonstrating that plaintiff

could work despite those limitations).  The ALJ's assessment of Murray's RFC is well-supported

by all of the opinions of record, including Toor's, Kouides's and Lambert's, and by Murray's

own testimony regarding his activities of daily living.

In his testimony, Murray repeatedly testified that he sits for the majority of the

day.  (Tr. 38-39, 41).  Although he indicated that he needs to adjust positions and to elevate his

leg, the ALJ specifically accounted for those limitations in his RFC assessment.  Although

Murray contends that his testimony suggested significant sitting limitations (Docket # 11 at 9),

he clearly testified that "[i]f my feet are up, I can sit for a long time."  (Tr. 39).  The only

reasonable interpretation of his testimony is that Murray is able to sit for prolonged periods so

long as he can alternate positions and elevate his leg.

Murray also maintains that Kouides's opinion that he was limited to sitting for up

to three hours a day is inconsistent with the ALJ's conclusion that Murray could perform

sedentary work.  (Docket # 9 at 17).  Murray ignores the remainder of Kouides's opinion,

however, in which she opines that Murray could work an entire eight-hour workday if he were

permitted to alternate positions and elevate his foot.  (Tr. 310).  The ALJ explicitly relied on this

statement in concluding that Kouides opined that Murray was "able to work a [forty] hour work

week at the sedentary level, with accommodations, including elevation of the right foot and frequent position changes." (Tr. 25). Those limitations were expressly accounted for by the ALJ in the RFC. Moreover, the ALJ's RFC is also supported by the opinion of and limitations assessed by Lambert, who authorized Murray's return to work with restrictions for standing and walking, but not sitting, and with a sit/stand option. (Tr. 255).

In his reply papers, Murray suggests that the ALJ did not explain the relative weights he accorded to Lambert and Kouides. (Docket # 11 at 8-9). I disagree. In his decision, the ALJ indicated that he gave greater weight to Lambert because her opinion was consistent with her findings and the medical record. (Tr. 25). Although the ALJ gave Kouides's opinion some weight, he noted that her opinion that Murray was unable to sit for more than five or ten minutes at a time was inconsistent with the medical record, Murray's daily activities, and his ability to sit in excess of ten minutes at the hearing. (*Id.*).

In conclusion, I find that the ALJ's RFC assessment was supported by substantial evidence. The record reflects that although Murray had sought treatment for his right foot and leg pain, he repeatedly reported that his pain was exacerbated by activity, particularly prolonged standing and walking. Little in the medical record suggests that Murray suffered from sitting limitations, and his own testimony indeed supports the ALJ's conclusion that he was able to sit for the majority of the day, provided he was permitted to adjust position and elevate his leg. The ALJ's RFC accounted for Murray's physical impairments by limiting him to sedentary work that permitted him to alternate positions and elevate his leg. Thus, the ALJ's RFC assessment was reasonable and supported by substantial evidence. *Pellam v. Astrue*, 508 F. App'x 87, 91 (2d Cir. 2013) ("[u]pon our independent review of the existing record, including [the consultative

examiner's opinion] and the treatment notes from [plaintiff's] doctors, we conclude that the

ALJ's residual functional capacity determination was supported by substantial evidence").

### B.   Credibility Assessment

I turn next to Murray's contention that the ALJ's credibility analysis is flawed

because he applied the incorrect legal standards and failed to consider all of Murray's testimony.

(Docket # 9 at 17-20).

An ALJ's credibility assessment should reflect a two-step analysis.  *Robins v.*

*Astrue*, 2011 WL 2446371, *4 (E.D.N.Y. 2011).  First, the ALJ must determine whether the

evidence reflects that the claimant has a medically determinable impairment or impairments that

could produce the relevant symptom.  *Id.* (citing 20 C.F.R. § 404.1529).  Next, the ALJ must

evaluate "the intensity, persistence and limiting effects of the symptom, which requires a

credibility assessment based on the entire case record."  *Id.* (citing 20 C.F.R. § 404.1529(c)).

The relevant factors for the ALJ to weigh include:

> (1) the claimant's daily activities; (2) the location, duration,
> frequency and intensity of the claimant's pain or other symptoms;
> (3) precipitating and aggravating factors; (4) the type, dosage,
> effectiveness, and side effects of any medication the claimant takes
> or has taken to alleviate [his] pain or other symptoms;
> (5) treatment, other than medication, the claimant receives or has
> received for relief of [his] pain or other symptoms; (6) any
> measures the claimant uses or has used to relieve [his] pain or
> other symptoms; and (7) other factors concerning the claimant's
> functional limitations and restrictions due to pain or other
> symptoms.

*Id.* (citing 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii)).

The ALJ concluded that Murray's "allegations of disabling symptoms and

limitations cannot be accepted."  (Tr. 25).  In doing so, the ALJ assessed Murray's subjective

complaints in the context of a comprehensive review of the entire record.  I disagree with

24

Murray's contention that the ALJ applied the incorrect legal standard or that his failure to fully discuss Murray's testimony warrants remand.

As an initial matter, I disagree with Murray insofar as he suggests that the ALJ was not permitted to consider his ability to sit through the hearing in assessing his credibility. (Docket # 9 at 18). Although not determinative as to credibility, a claimant's appearance and demeanor during a hearing may be considered in assessing credibility. *See Schaal v. Apfel*, 134 F.3d at 502 ("there is no *per se* legal error where the ALJ considers physical demeanor as one of several factors in evaluating credibility"). In his decision, the ALJ noted that Murray's ability to sit throughout the entire hearing was inconsistent with Kouides's opinion that Murray must be permitted to stand after only five or ten minutes of sitting. (Tr. 25). In addition to Murray's demeanor during the hearing, the ALJ also considered Murray's medical records and found them inconsistent with Murray's allegations of disabling impairments. (*Id.*). Accordingly, I conclude that the ALJ properly considered Murray's ability to sit through the entire administrative hearing in assessing his credibility.

Murray also maintains that remand is warranted because the ALJ failed to discuss the side effects of his medication and his inability to perform some activities of daily living in evaluating his credibility. I disagree. "[A]n ALJ is not required to discuss every piece of evidence submitted[,] . . . [and] [a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). During the administrative hearing, Murray testified concerning his activities of daily living and the side effects of his medication. (Tr. 38, 41-43). Although the ALJ did not necessarily discuss every activity that Murray claimed he was unable to perform or his allegations relating to the side effects of his medication, nothing suggests that the ALJ did not in

fact consider this testimony in evaluating Murray's credibility.  Indeed, the ALJ specifically indicated that he considered the factors set forth in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) and SSR 96-7p in his credibility evaluation.  *See Lozama v. Colvin*, 2016 WL 1259411, *7 (N.D.N.Y. 2016) (ALJ's failure to explicitly discuss alleged medication side effects did not warrant remand where ALJ stated that she specifically considered the relevant factors and her credibility assessment was otherwise supported by the record).

In sum, I conclude that the ALJ applied the proper legal standards in analyzing Murray's subjective complaints and that substantial evidence supports the ALJ's determination that Murray's complaints were not entirely credible.  *See Luther v. Colvin*, 2013 WL 3816540, *7 (W.D.N.Y. 2013) (ALJ properly assessed subjective complaints where she "reviewed all of [p]laintiff's subjective complaints . . . [and] properly considered [p]laintiff's activities of daily living, inconsistent testimony and how her symptoms affected her attempts at maintaining a job").

C.     **Step Five Assessment**

Finally, I turn to Murray's argument that the ALJ erred in relying upon Andrews's testimony at the fifth step of the sequential analysis.  (Docket ## 9 at 12-14; 11 at 2-7). According to Murray, Andrews's testimony was inconsistent with the DOT, and the ALJ failed to resolve this inconsistency in accordance with the requirements of Social Security Rule ("SSR") 00-4p.  (*Id.*).

In this case, the ALJ concluded that Murray had the RFC to perform sedentary work as long as he was permitted to periodically alternate positions from sitting to standing and to elevate his leg while seated.  During the administrative hearing, the ALJ posed questions to Andrews designed to elicit her expert opinion as to whether positions existed in the national

economy that an individual with Murray's RFC could perform.  (Tr. 46-48).  Andrews testified

that such an individual could perform the positions of brake linings coater and label pinker.

Andrews indicated that her testimony was consistent with the DOT, with the exception of the

"sit/stand option."  (Tr. 48).  According to Andrews, the DOT did not provide any information

relating to a sit/stand option and her testimony that the identified positions would permit an

employee to stand briefly after sitting for thirty minutes was based upon her knowledge and

experience.  (*Id.*).

       Murray maintains that Andrews's testimony that he could perform the positions of

brake linings coater and label pinker, despite requiring a sit/stand option and the ability to elevate

his leg, conflicts with the DOT because the DOT does not specifically address whether those

positions would permit an employee to alternate positions or elevate their leg.  (Docket ## 9 at

12-14; 11 at 2-7).  Murray concedes that Andrews testified that the DOT did not address a

sit/stand option and does not challenge that she adequately explained, in accordance with SSR

00-4p, the basis for her conclusion that Murray could perform the identified positions despite

needing to alternate positions.  (*Id.*).  Rather, Murray maintains that remand is required because

Andrews failed to provide similar testimony with respect to his need to elevate his leg.  (*Id.*).  I

do not believe that remand is warranted for this reason.

       SSR 00-4p provides that a vocational expert's testimony should generally be

consistent with the occupational information contained in the DOT and "[w]hen there is an

apparent unresolved conflict between [the testimony] and the DOT, the [ALJ] must elicit a

reasonable explanation for the conflict before relying on the [vocational expert's testimony]."

*See* SSR 00-4p, 2000 WL 1898704 (SSA 2000).  "Accordingly, the ALJ has a duty to elicit a

reasonable explanation for any 'apparent unresolved conflict' between the [vocational expert's

testimony] and the DOT, and to explain the resolution of the conflict before relying on the [testimony] in the decision." *Barone v. Colvin*, 2016 WL 4126544, *11 (S.D.N.Y. 2016).

As an initial matter, I conclude that SSR 00-4p did not require the ALJ to examine Andrews further about the leg elevation option because no actual conflict existed between Andrews's testimony and the DOT. As the Second Circuit has recognized, "many specific jobs differ from those jobs as they are generally performed, and the [vocational] expert may identify those unique aspects without contradicting the [DOT]." *Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d Cir. 2003). The DOT simply does not address whether particular positions would permit an employee to elevate his or her leg while seated during the workday. *See Myers v. Colvin*, 2016 WL 2991059, *3 (E.D. Ark.) (recognizing that the DOT "does not address the need to elevate the legs"), *report and recommendation adopted*, 2016 WL 1755835 (E.D. Ark. 2016). Because there was no actual conflict, further inquiry was not required. *See Barone v. Colvin*, 2016 WL 4126544 at *12 ("[t]here is no actual conflict under SSR 00-4p[;] [b]ecause the DOT does not address the availability of a sit/stand option, the silence is not contradicted by the vocational expert's testimony which endorsed such an option"); *Pitts v. Colvin*, 2015 WL 3823781, *6 (W.D.N.Y. 2015) ("[h]ere, no such conflict existed, because the DOT job description does not address the availability of a sit/stand option[;] [t]hus, this does not contradict the vocational expert's testimony, which endorsed such an option"); *Pahl v. Colvin*, 2013 WL 3761545, *6 (W.D.N.Y. 2013) ("it is not error for the ALJ to rely on the [vocational expert's] testimony of a sit/stand option so long as there is no actual conflict between the [expert's] testimony and the [DOT][;] [n]o such conflict existed here because the DOT does not address the availability of a sit/stand option") (internal quotations omitted); *Diakogiannis v. Astrue*, 975 F. Supp. 2d 299, 319 (W.D.N.Y. 2013) (finding no conflict between DOT and vocational expert's testimony that

plaintiff could perform positions despite inability to perform overhead reaching where DOT silent on overhead reaching); *Wellington v. Astrue*, 2013 WL 1944472, *4 (S.D.N.Y. 2013) (proper inquiry is not whether ALJ inquired into potential conflicts with DOT, but whether there was actual conflict; "[b]ecause the DOT does not address the availability of a sit/stand option, it cannot contradict the vocational expert's testimony"); *Schmitt v. Astrue*, 2012 WL 4853067, *3 (N.D.N.Y. 2012)  ("[t]he DOT does not categorize or describe jobs by the requirement of being able to sit or stand at will[;] [t]herefore there is no conflict on that ground between [the vocational expert's testimony] and the DOT"); *Manning v. Astrue*, 2012 WL 4127643, *8 (D. Vt.) ("there was no 'conflict' between the [vocational expert's testimony and the DOT[;] [r]ather, the DOT did not apply, given that it does not provide a job addressing the particular hypothetical, including a sit/stand option"), *report and recommendation adopted*, 2012 WL 4127641 (D. Vt. 2012); *Martin v. Comm'r of Soc. Sec.*, 2008 WL 4793717, at *2 (N.D.N.Y. 2008) ("'expert [testimony] and the [DOT] conflict where they disagree[ ] in categorizing or describing the requirements of a job as it is performed in the national economy[;]' [t]he DOT's mere failure to mention every single characteristic of [plaintiff's] limitations in every job available for her does not constitute disagreement") (quoting *Jasinski v. Barnhart*, 341 F.3d at 184).  *But see Gallegos v. Colvin*, 2014 WL 4635418, *3-4 (D. Conn. 2014) (duty to resolve conflict pursuant to SSR 00-4p triggered where hypothetical posed to vocational expert included a sit/stand option and DOT was silent as to sit/stand option).

       The ALJ specifically asked Andrews whether her testimony about available positions would change if an individual would need to elevate his leg while seated.  (Tr. 47). Andrews answered that question, thus demonstrating that she considered this limitation in identifying positions consistent with Murray's RFC.  It is reasonable to infer from her testimony

that where the DOT did not specifically address a limitation about which she testified, her testimony about leg elevation derived from her knowledge and experience, just as her testimony about the sit/stand option did.  (Tr. 48).  Under such circumstances, I find that remand is not necessary.[3]

## CONCLUSION

This Court finds that the Commissioner's denial of SSI was based on substantial evidence and was not erroneous as a matter of law.  Accordingly, the ALJ's decision is affirmed. For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 10)** is **GRANTED**.  Murray's motion for judgment on the pleadings **(Docket # 8)** is **DENIED**, and Murray's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**

_____
                    _s/Marian W. Payson_
                    MARIAN W. PAYSON
                    United States Magistrate Judge

Dated: Rochester, New York
          September 23, 2016

---

[3] Of course, Murray was represented at the hearing by an attorney who could have explored this issue.  *See Murray v. Colvin*, 2013 WL 6145769, *8 (W.D.N.Y. 2013) ("the [p]laintiff failed to bring any inconsistency between the [vocational expert's] testimony and the DOT to the attention of the ALJ[;] [t]he ALJ is not required to conduct his own investigation of the [vocational expert's] testimony in order to determine its accuracy"); *Pasic v. Comm'r of Soc. Sec.*, 2012 WL 3782563, *10 (D. Vt. 2012) (recognizing without deciding that "other circuits have held that a claimant may not, as [plaintiff] attempts to do here, argue to the district court that the [vocational expert's] testimony conflicts with the DOT where the claimant or his attorney did not raise the issue at the administrative hearing, at least in cases where the alleged conflict is not apparent or obvious"); *Lind v. Astrue*, 530 F. Supp. 2d 456, 463 n.4 (W.D.N.Y. 2008) ("although plaintiff's counsel asked the [vocational expert] generally about the extent of contact with the public involved in these jobs, he did not inquire about any particular temperament requirements[;] [h]e cannot now premise an alleged conflict based on such requirements"); *Perez v. Barnhart*, 440 F. Supp. 2d 229, 233 n.1 (W.D.N.Y. 2006) (noting that SSR 00-4p "requires an explanation only if the discrepancy was 'identified' – that is, if the claimant (or the ALJ on his behalf) noticed the conflict and asked for substantiation[;] [r]aising a discrepancy only after the hearing … is too late") (quoting *Donahue v. Barnhart*, 279 F.3d 441, 446-47 (7th Cir. 2002)).